# EXHIBIT 2

# EXPERT REPORT

**CASE: 6:14-CV-46**

**DARIUS ISHUN GREEN**
**Plaintiff,**
**V.**
**HOOKS, ET AL**

**JOSEPH E. GUNJA**

## I. Case Summary

The law firm of Williams Oinonen LLC has retained me in order to review the facts of *Darius Ishun Green v. Brad Hooks, et al.* and formulate opinions as a Corrections and Prison/Jail Expert pertaining to the actions of the State of Georgia, its employees and agents involving Mr. Darius Green. I have completed my review of the documents provided and my report follows. I am prepared to offer testimony in this action, including the opinions set forth in my report. The report is divided into five sections: (II) qualifications, background and expertise; (III) materials reviewed; and (IV) summary of opinions.

## II.    Expert Qualifications

I have over 30 years of experience in the corrections field, with over 27 years with the Federal Bureau of Prisons, and over two years in the private corrections arena. I held every security position with the BOP, as well as every mid-level, upper-level, and executive management position with the agency—covering every security level facility, regional office, and headquarters. I have worked at twelve different facilities, was a warden at three facilities, administrator in headquarters, and regional director for the western region before retiring in 2007. Based on my excellence in correctional leadership and management, I was appointed to the Senior Executive Service in 2002, and received three national awards. As regional director, I was responsible for supervising all nineteen (19) wardens at their facilities, as well as overseeing all operations at these facilities during on-site visits, audits, and program assessments. I also supervised eighty (80) regional office staff and administrators, who had responsibilities for providing support, guidance, and oversight in their respective discipline and area of expertise. I continue to be a leading speaker, trainer, advisor, and mentor in the corrections field, both in the Federal and state sector. I am a professional member of the American Correctional Association, Missouri Correctional Association, and American Jail Association.

Due to my lengthy and noteworthy career, I feel extremely confident in my ability to evaluate and assess a critical incident, events leading to these incidents, after-action reviews following an incident, as well as providing an opinion on staff's performances. My CV and Fee Schedule is attached to the end of this report.

### III.   Materials/Documents Reviewed

The following are the materials I was provided for review, which are the basis for my expert opinions.

1. Darius Ishun Green, Plaintiff v. Warden Brad Hooks, Deputy Warden John Brown, Leiutenant Torie Grubbs, and John Doe. Jury Trial Demanded/Complaint. In the United States District of Georgia Statesboro Division, filed 5/17/14

2. Darius Ishun Green, Plaintiff v. Brad Hooks, et al. Defendants' Answer and Defenses. In the United States District of Georgia Statesboro Division, filed 7/2/14

3. Darius Ishun Green, Plaintiff v. Charles Calhoun, Brad Westberry, John Jordan, Wayne Cook, Christopher Gay, Mark Smith, Terry Calhoun, Jermaine Calhoun, Cynthia Calhoun, Jettie Calhoun, Shawn Calhoun, Benjamin Mourad, Basahan McIntosh. Jury Trial Demanded/Complaint. In the United States District of Georgia Statesboro Division, filed 9/19/14

4. Mario Williams' letter to the Georgia State Department of Corrections re: Issue with Former Subpoena, dated 9/24/14

5. Darius Ishun Green, Plaintiff v. Brad Hooks, et al. Notice of Service of Subpoena for the Production of Documents. In the United States District of Georgia Statesboro Division, filed 5/17/14

6. District Attorney's "investigative file" provided to Mario Williams on 10/3/14

7. Darius Ishun Green's Offender Personal Data Summary, provided by the Georgia DOC

8. Darius Ishun Green's Certification of Completion of Motivation for Change, awarded by the Georgia DOC

9. Darius Green's Disciplinary History, DOC

10. Darius Green: Parole Decisions Guidelines—Notice of Tentative Action, 4/15/14

11. Darius Green's photograph

12. Darius Green's medical records, including nursing assessment forms, intersystem transform forms, medical encounter forms, etc.

13. Darius Green's classification forms, including counselor report forms and jail to state prison health forms

14. Darius Green's Security Classification Summary from the Georgia DOC

15. Darius Green's Segregation/Isolation Check list from the Georgia DOC

16. Darius Green's letter to her mother, not dated

17. Darius Green's Inmate Grievance Form, dated 10/2/12

18. Darius Green's Witness Statement, undated ("9-?)

19. Darius Green's inmate photo identification checklist, dated 11/2/14

20. Darius Green's Segregation Housing form, dated 9/21/12

21. Darius Green's Movement History, provided by the Georgia DOC

22. Darius Green's Witness Statement, dated 9/22/14

23. Darius Green's Informal Grievance Form, dated 9/22/12

24. Darius Green's Informal Grievance Form, dated 9/22/12

25. Darius Green's Confidential Inmate Grievance Form, dated 9/24/12

26. Darius Green's Informal Grievance Form, dated 9/30/14

27. Darius Green's Witness Statement, dated 9/20/14

28. Darius Green's letter to inmate Ms. Jazz

29. Darius Green's requests for documents, dated April 2013

30. Darryl Ricard's Movement History, provided by the Georgia DOC

31. Darryl Ricard's Administration Segregation Assignment Memo, dated 9/21/12

32. Darryl Ricard's Witness Statement, dated 9/20/12

33. Darryl Ricard's Inter-Institutional Transfer Request, dated 9/21/11

34. Darryl Ricard's Reassignment form, dated 9/22/11

35. Darryl Ricard's Inmate file, including diagnostic reception, orientation, and processing; inmate criminal history; classification committee forms; performance record sheet; and offender criminal history.

36. Darryl Ricard's Witness statement, dated 8/16/05

37. Darryl Ricard's disciplinary investigative summary, dated 2/1/11

38. Darryl Ricard's security profile details, including witness statements

39. Darryl Ricard's Inter-Institutional Transfer Request, dated 9/21/14

40. Darryl Ricard's Classification Committee Form, dated 11/27/12

41. Darrryl Ricard's Informal Grievance Form, dated 10/15/12

42. Darryl Ricard's Segregation Hearing form, dated 11/29/12

43. Darryl Richard's Disciplinary History

44. Georgia DOC Incident report # 107807, dated 9/22/12

45. Georgia DOC Incident report #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

46. Georgia DOC Segregation/Isolation Check list for Darryl Ricard

47. Audio file of Internal Affairs interview with Green

48. Audio file of Internal Affairs interview with Ricard

49. Georgia Department of Corrections Standard Operating Procedures. Functional Area: Facilities Operations, Subject Area: Initial Security Classification/Security Reclassification

50. Georgia Department of Corrections Standard Operating Procedures. Functional Area: Facilities Operations, Subject Area: Administrative Segregation

51. Georgia Department of Corrections Standard Operating Procedures. Functional Area: Health Services—Physical Health, Subject Area: Management of Transsexuals

52. Georgia Department of Corrections Standard Operating Procedures. Functional Area: Facilities Operations, Subject Area: Administrative Segregation

53. Sexual Assault Charts for Rogers State Prison

54. Performance Management Form (PMF), State of Georgia

55. *Goodman v. Kimbrough.* United States Court of Appeals, Eleventh Circuit.

## IV.    Summary of Opinions

I have read Expert Dr. Jenness's report and I concur with the reasoning and findings in that report and thus expressly incorporate Section III of Dr. Jenness's report into this report. Further, based upon my independent review of the facts thus far provided to me, I state the following:

Based on my review of the documents identified above, as well as on my training and research, it is my opinion that that there is an abundant amount of evidence that the defendant violated various standards that caused Mr. Green to be placed in substantial risk of harm and also suffer injuries including being raped.

Transgender inmates in prisons for men are considerably much more subjected to sexual assault than other inmates. It is imperative and of the utmost concern to insure these types of inmates are properly segregated and housed, so sexual assaults are not allowed to occur. In this case, Mr. Green was not properly managed for his own well-being and safety. The facts demonstrate that the Defendants violated several standards within the correctional facility that caused Mr. Green to suffer the harm of sexual assault.

Mr. Green was by all information, impressions, and facts a minimum security inmate, and should never have been housed with a higher security inmate (Ricard) who had a known history of sexual assault. It is my opinion that the evidence in this case placed correctional officials on notice that Green should not have been placed in a cell with a convicted rapist and gang member, and

7

that correctional officials knew that Ricard should not have been placed in the same cell with Green because he posed a substantial risk of harm to green (a known transgender). There were most likely numerous staff making security rounds of the housing where both inmates were housed at.

Additionally, the missing security checks can lead a rational jury to conclude that security checks did take place and thus security official did check on Ricard and Green. A jury could conclude that it makes no sense to have Ricard's check lists from September 23 on, but somehow do not have his checklists for the dates of this incident (Sept. 21 and 22). The missing checklists represent critical information about the knowledge defendants and other officials had in relation of risk of harm to Mr. Green. In addition, based on my vast experience within correctional facilities, it is my opinion that the missing check lists for the dates of September 21 and 22, 2012 contained vital information about the knowledge of the risk of harm to Green by being in a protective custody cell with a convicted rapist and child molester, and known gang member. For example (but not conclusive), these check lists would easily show the names of security officers and supervisors and other officials who checked on both Ricard and Green and thus knew Green (a known transgender) was in a protective custody cell with a convicted rapist, child molester (or anyone for that matter), and the checklists would also easily show mental impressions with respect to both Green and Ricard. In sum, the missing check lists, based on my experience, hampers Plaintiff's ability to fully develop his case in various ways.

The alleged mistreatment that Green endured while in the Rogers State Prison as a result of the defendants' deliberate indifference, i.e., anal rape and sexual assaults while in general population is very serious, and in my previous correctional career with the Federal Bureau of Prisons, guaranteeing the safety of the public, staff, and inmates was of paramount concern. Keeping prisoners safe from harm is a primary goal for any prison. To the degree that Green was harmed in Rogers State Prison in ways that could have been avoided by correctional officials forgoing actions they took (i.e., placing Green in a protective custody cell with her assailant—a convicted rapist with a higher classification level) and taking actions in ways that are not revealed in the fact pattern of this case (i.e., providing protective custody in ways that are consistent with standards before the alleged harm), the prison failed to meet its obligation along these lines.



The evidence I reviewed demonstrates that the prison officials subjectively knew of the substantial risk of harm, and they knowingly or recklessly disregarded that risk. Additionally, it is my professional opinion the risk to Mr. Green was more than obvious. Based on my experience, transgender and/or transsexual inmates are a well known and easily identifiable vulnerable group that are at an obvious risk when housed with convicted rapists, murders, and inmates who have medium and close security status.



Also, the Warden received a letter from the DOC Ombudsman from Mr. Green's Mother, who stated her son's life was in danger. This proves circumstantial evidence that put prison officials on notice and the officials (Warden and Deputy Warden of security) recklessly disregarded that risk by sending a known transgender inmate, who looks feminine, back to general population.



The standards of correctional conduct, in my opinion, were violated in this case, as the Warden and Deputy Warden, and likely other officials, did not look out for the welfare and well-being of Mr. Green by directly putting him in a situation wherein he was at a significant risk of being assaulted sexually and/or violently, as did occur.

This is the end of my report, but I reserve the right to make changes and modification as additional or corrected information is provided to me.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of October, 2014.

Joseph E. Gunja

October 22, 2014

October 23, 2014



**SIMCO Correctional Consulting, LLC**
PO Box 1185, Nixa, Mo. 65714
Office/Cell (417) 224-5215
www.simco1.com  •  joe@simco1.com

## List of Represented Cases within the past four years:

<u>DEPOSITION</u>-  Palmer v. State of Arizona, et al., US Dist. of Arizona ; No: CV 09-1791 PHX JWS

<u>DEPOSITION AND TRIAL TESTIMONY</u>- Evans, et. al., v. W. Va. Regional Jail and Correctional Facility, U.S. Southern District Court of W.Va.; No: 2:12-cv-3838

<u>DEPOSITION</u>- Kevin Schawitsch vs. Chad Downs and Brent Fischer, U.S. Disctict Court, Central District of Illinois; No: 11-3117

Joseph E. Gunja



**SIMCO Correctional Consulting, LLC**
PO Box 1185, Nixa, Mo. 65714
Office/Cell (417) 224-5215
www.simco1.com  •  joe@simco1.com

# Fee Schedule

The following details the fees I routinely charge for providing consultation services as an expert witness.

Telephone Consultation with Attorney(s) - $150 per hour
Review of Materials - $150 per hour
Research - $150 per hour
Report Writing - $150 per hour
Telephone Interviews - $150 per hour
On-Site Interviews and Investigation - $150 per hour
Witness Preparation - $400 per hour
Testimony - $750 per hour (2 hour minimum)
Witness Deposition - $400 per hour (2 hour minimum)
*Travel - $150 per hour plus expenses

Retainer Fee is $2,000.00, unless otherwise negotiated

* Expenses are defined as airline tickets/rental car/lodging (when necessary), and meals.  I charge a fee of $.75 per mileage when it is necessary for me to use my personal vehicle.

Payment Details:  Payment is due within 21 calendar days of your receipt of my invoice(s) or retainer letter(s).  Late Fees will be assessed at a rate of 5% daily beyond this 21-day period.

Thank You,

*Joe Gunja*



**SIMCo**
Excellence In Correctional Consultation

## Joseph E. Gunja
247 Majestic Oak – P.O. Box 1185, Nixa, Mo. 65714
Cell (417) 224-5215
Fax (417) 714-9086
Web: www.simco1.com   •   Email: joe@simco1.com

## PROFILE

- ➢ More than 28 years of corrections experience in a variety of challenging locations and positions with the Federal Bureau of Prisons

- ➢ Over one year as Warden at the Correctional Corporation of America's Northeast Ohio Correctional Center in Youngstown, Ohio

- ➢ One three years as CEO/President of SIMCO Correctional Consulting, LLC, where I personally provided correctional advocacy, consulting, and expert witness expertise for a variety of clients.

- ➢ Nine (9) months as Warden at the Cornell Companies' Great Plains Correctional Facility in Hinton, Oklahoma

- ➢ Twenty-one (22) years of experience in correctional supervisory and management

- ➢ Thirteen (14) years of experience in correctional executive level management as an Associate Warden, Warden, and Regional Director

- ➢ Two years experience as Regional Director for the Federal Bureau of Prisons' Western Region, where I was responsible for complete oversight of 18 institutions and supervising all wardens at these facilities and 65 regional office administrators and other staff.

- ➢ Three years of experience at the Federal Bureau of Prisons Headquarters, with emphasis in training, policy development, crisis evaluation, crisis intervention, and auditing

- ➢ Regarded as an expert in all areas of correctional management, oversight, inmate care and custody, policy, ethics, and training

## PROFESSIONAL EXPERIENCE

February 2010 to November 2011
Chief Executive Officer (Warden)
Cornell Companies' and GEO Group's Great Plains Correctional Center in Hinton, Oklahoma.
<u>Duties</u>: I am responsible for a manpower complement of 335 employees and 1,760 inmates.
Oversee all operations at this facility, to include, but not limited to, all physical and operational
security, staff training, Segregation management, inmate programs, and constant on-site
supervision of all areas of the facility. Since my arrival, we have improved the institution's
image in the community, sponsoring several community service projects and developing a
GPCF Community Involvement Committee. Also, since my arrival, we have successfully
passed at high levels all contractor and local audits.

February 2008 to Present.
CEO/President, SIMCO
Duties:  Operated and managed my own correctional consultation and expert witness service

July 2007 to February 2009
Chief Executive Officer (Warden)
Correctional Corporation of America's Northeast Ohio Correctional Center in Youngstown, Ohio.
<u>Duties</u>: I was responsible for a manpower complement of 405 employees and 2,000 inmates.
Oversaw and managed 1,400 Bureau of Prisons low security deportable aliens and 600 U.S.
Marshall's pre-trial holdover prisoners and sentenced inmates.   I was responsible for a budget
of over $18,000,000, and successfully passed at high levels all BOP, CCA, American
Correctional Association (ACA), and Joint Commission of Adult Health Organizations' (JCAHO)
audits.

2006 to 2007
Chief Executive Officer (Warden)
U. S. Medical Center for Federal Prisoners, Springfield, Missouri
<u>Duties</u>:  I was responsible for a manpower complement of 600 employees and 1,300 inmates.
Oversaw and managed the largest medical center in the Federal Bureau of Prisons, with
emphasis in all levels of medical care and treatment.  This included, but was not limited to:
severe and end stage disease treatment, dialysis treatment, ambulatory care, psychiatric and
severe mental health treatment, and behavioral disorder management.  I oversaw a budget of
over $40,000,000.  Continued to be a nation-wide sought-after speaker and technical expert
relating to issues of crisis management, security procedures, special housing unit operations,
and leadership.  I retired from the Federal Bureau of Prisons in 2007.

2004 to 2006
Chief Executive Officer (Regional Director)
Western Regional Office, Dublin, California
<u>Duties</u>:  I was responsible for all 18 institutions in the Western Region, which included
California, Arizona, Oregon, Washington, Hawaii, and Nevada.  This was comprised of over
4,000 employees and 19,000 inmates.  Additionally, I was responsible for  fiscal management
and budget control of over $500,000,000, during some extremely difficult and trying budget
times within the Department of Justice and Bureau of Prisons.  Implemented a variety of cost
and staffing reductions due to national budgetary limitations, which included management layer
decreases, special program modifications, and two facility deactivations.  Personally developed
and managed several innovative staff and inmate safety programs, crisis prevention, emergency
preparedness and response, and leadership development.  Lauded the lowest number of labor
grievances and EEO complaints than any other region in the nation.

2001 to 2004
Chief Executive Officer (Warden)
United States Penitentiary, Florence, Colorado
<u>Duties</u>: I was responsible for a manpower complement of over 300 employees and 1,100 extremely volatile and violent inmates. I oversaw and managed a very difficult inmate population, which included the highest number of gang members in the nation. Likewise, it was necessary to implement and operate many unique programs to maintain tight control, and security to enhance the safety for both inmates and staff. I also developed an innovative intelligence-gathering and counter-intelligence program, which was later used on a nation-wide basis. This program reduced violence at USP Florence by over 60%. Additionally, I was responsible for fiscal control of a $18,000,000 budget. In addition, I developed and managed a highly efficient emergency preparedness and response system.

1999 to 2001
Chief Executive Officer (Warden)
Federal Correctional Institution, Cumberland, Maryland
<u>Duties</u>: I was responsible for a manpower complement of over 250 employees and 1,500 inmates, and oversaw all operations within a large medium-security correctional institution and a satellite camp, which housed offenders predominantly from the Eastern U. S. Also developed an improved system to better equip staff with the tools to properly prevent and respond to critical incidents by creating a Command Center Management Team and conducting in-depth mock drills 8-10 times a year. I implemented a variety of staff-oriented programs to allow all staff to achieve their career development aspirations, i.e., leadership development, staff assistance groups, speaker's bureau seminars, and bi-annual department retreats. In order to improved the institution's image in the community, I sponsored several community service projects involving minimum security inmates and my employees.

1997 to 1999
Associate Warden of Custody
United States Penitentiary, Leavenworth, Kansas
<u>Duties</u>: As the Associate Warden of Custody, I was responsible for overseeing all programs and operations applicable to security, custody, and inmate management. Based on several critical incidents involving inmate groups and gangs, I was the lead manager for the initial response, lock-down management, and eventual resolution phase. I enhanced and improved emergency preparedness and response programs. Due to the unfortunate off-duty deaths of two employees, I coordinated consolation efforts with the family, memorial services, and lending assistance to staff who were grieving.

1995 to 1997
Associate Warden
Federal Correctional Institution, Three Rivers, Texas
<u>Duties</u>: As the Associate Warden of Operations and Programs, which I served in equal 18-month increments, I was responsible for overseeing all programs and operations applicable to the specific division. This assignment allowed me to acquire "a bird's eye view" of all operations throughout the entire facility, which later prepared me for more responsible assignments. During approximately eight months, due to the absence of the Warden, I was temporarily promoted to Acting Warden. I received a Special Act Award from the Regional Director for my performance during this time. Based on several critical incidents involving inmate groups and gangs, I was the lead manager for the initial response, lock-down management, and eventual resolution phase.

1992 to 1995
Assistant Correctional Services Administrator
Central Office (Headquarters), Washington, D.C.
Duties: I was responsible for the training, policy development, and assistance to lieutenants and captains in the field. I was also responsible for providing in-person training 10-12 weeks per year at the Management and Specialty Training Center in Aurora, Colorado. During two critical incidents in the field, I was responsible for managing the National Command Center, and directing the operations and flow of communication to the Assistant Director and Director. These two incidents were a hostage situation at the United States Penitentiary in Allenwood, Pennsylvania, and Hurricane Andrew which affected our institution in Miami, Florida. In addition, I was either the team leader or a team member in conducting After-Action Reviews and Board of Inquiries following significant incidents in the field, such as inmate homicides, disturbances, escapes and escape attempts, inmate suicides or other questionable deaths, and serious staff assaults.

1991 to 1992
Chief Correctional Supervisor (Captain)
United States Penitentiary, Lompoc, California
Duties: I was responsible for the security, safety, custody and inmate management of the institution and satellite camp. While this inmate population had the potential to become very volatile and violent, I was able to prevent, detect, and deter most serious incidents by maintaining and fostering great communication skills with staff and inmates. During my tenure, there were no serious inmate or staff injuries. I was also able to improve staff's performance by developing and providing training on a variety of topics relating to management of inmates and other security practices and procedures. During my tenure, I identified a significant security breach in which inmates could have escaped through the interior drainage system. Once identified, the security breach was sealed off. I received a Special Act Award from the Warden and a Letter of Commendation from the Regional Director for my performance during this situation.

1990 to 1991
Chief Correctional Supervisor (Captain)
Federal Correctional Institution, Seagoville, Texas
Duties: As the Chief of Security, I was responsible for the security, safety, custody and inmate management of the institution. I developed a training program to prepare senior correctional officers for the position of lieutenant (first line correctional supervisor), and over 30 employees successfully complete this program. Most of these employees became mid-level or upper-level managers. I received the Bureau of Prisons' National Award for "Correctional Services Award for Career Development" for establishing this training program, and it was later used as a training tool for other programs at the Management and Specialty Training Center in Aurora, Colorado. During a program review of correctional services in 1990, I received the highest rating ever achieved since the inception of the new Program Review Division, wherein only minimal deficiencies were identified, and several areas of strength were noted. To encourage teamwork, I developed staff committees in numerous areas and disciplines, so all staff could play an integral role in the way the correctional services department was managed.

4

1989 to 1990
Correctional Supervisor (Lieutenant)
Federal Correctional Institution, La Tuna, Texas
Duties:  As a first-line shift supervisor, I was responsible for the security, safety, custody and inmate management.  I responded to critical incidents and controlled the situation to prevent serious escalation and further disruption.  During my tenure as the chief facility investigator, I conducted inmate and staff investigations, all of which were closed in a timely manner. I also provided training to staff pertaining to inmate/gang management, and identifying security concerns.  I was also the leader of a newly created Special Operations Response Team, and I held this position for over a year.  This SORT was brought from novices to specialty experts who could respond and react to any critical incident.  My SORT actually responded to a disturbance at a contract facility in Eden, Texas.  I received the local 'Supervisor of the Year Award" for my outstanding supervisory and leadership skills.

1987 to 1989
Correctional Supervisor (Lieutenant)
Federal Correctional Institution, Oxford, Wisconsin
Duties:  As a shift supervisor, I was responsible for the security, safety, custody, and inmate management, and responded to critical incidents and controlled the situation to prevent serious escalation and further disruption.  I also conducted inmate and staff investigations, all of which were closed in a timely manner.  I also provided training to staff pertaining to inmate/gang management, and identifying security concerns.  Due to my computer programming skills, I developed a user-friendly inmate visitation management program for all staff to utilize.  I also developed several other computer applications for the Armory and Special Investigative Office. Some of these were later adopted for implementation on a nation-wide basis.

1980 to 1987
Correctional Officer
United States penitentiary, Leavenworth, Kansas
Duties:  As a correctional officer, I was responsible for the security, safety, custody, and inmate management in my assigned area.  When required, I also responded to critical incidents, and, along with other staff, de-escalated further significant concerns and disruption by controlling the incident in an expeditious manner.  In two separate incidents, I saved an inmate's life during a major assault by other inmates.  My tenure as a correctional officer for nearly seven years allowed me to become aware of all facets of corrections by being placed in virtually all areas of the institution.  This prepared me for later promotions and transfers to positions with more responsibility.

1978 to 1979
Police Officer
Independence (Missouri) Police Department
Duties:  Upon graduation from the harry S. Truman Police Academy, I was assigned as a Patrol Officer.  My duties consisted of enforcing laws, investigating traffic accidents, and responding to emergency situations.  I was also involved in several drug investigations with the DEA.

1975 to 1978
Military Policeman (U.S. Army)
Fort Hood, Texas
Duties:  Upon graduation from MP School I was transferred to Fort Hood, Texas, and remained there my entire service time.  I spent one year as Patrol MP, then was selected to the AWOL and Deserter Apprehension Unit.  Our unit was responsible tracking and arresting AWOL and Deserter soldiers in Texas and Southern Oklahoma.  We lauded the highest apprehension rate in the entire U.S. Army in 1977.

**EDUCATION AND TRAINING**

1978 to 1979
Harry S. Truman Police Academy
Independence Police Department
Independence, Missouri

1982 to1985
Two Years College
Maple Woods Community College, Kansas City, Missouri
Park College, Parkville, Missouri

1990
Dale Carnegie Public Speaking Course
Dallas, Texas

1992
Federal Bureau of Prisons' "Director's Public Administration and Policy Management Seminar"
Washington, D.C.

February to March 1999
Office of Personnel Management (OPM) "Executive Leadership Seminar"
Denver, Colorado

May to October 2002
National Institute of Justice (NIC) "Executive Excellence in Corrections"
Longmont, Colorado

## HONORS AND AWARDS

July 1989
Supervisor of Year Award
Federal Correctional Institution, La Tuna, Texas
Position Held: Correctional Supervisor (Lieutenant)

May 1990
National Award -- Correctional Services Award for Career Development
Federal Correctional Institution, Seagoville, Texas
Position Held: Chief Correctional Supervisor (Captain)

May 1999
National Award -- North Central Region Associate Warden of the Year
United States Penitentiary, Leavenworth, Kansas
Position Held: Associate Warden

June 2000
National Award -- Wardens Staff Development Award
Federal Correctional Institution, Cumberland, Maryland
Position Held: Warden

April 2002
Appointment to the U.S. Government Senior Executive Service (SES)
United States Penitentiary, Florence, Colorado
Position Held: Warden

2003 to 2005
Three (3) Senior Executive Service Performance Awards

2008
Performance Award Bonus
Correctional Corporation of America, Northeast Ohio Correctional Center
Youngstown, Ohio

## ASSOCIATIONS AND MEMBERSHIPS

Professional Member II, American Correctional Association
Member, North America Association of Wardens and Superintendents
Member, Missouri Correctional Association
Professional Member, Expert Pages
Member, National Sheriff's Association
Member, National Jail Association

**PUBLISHED PAPERS, ARTICLES AND MANUALS**

1993
Correctional Volunteer Magazine, "Understanding Security in Jails and Prisons"
Correctional Volunteer Magazine, "Safety and Security"

2000 to 2001
Leadership Development Training Manual
(Developed training manual for a leadership program I created for low and mid level managers)
Federal Correctional Institution, Cumberland, Maryland

2003-2004
The Intelligence and Information System Training (IIMS) Manual
(Developed a training manual for a program I developed to increase and improve intelligence gathering and counter-intelligence to decrease violence and significant incidents.  This program was later used on a nation-wide basis following a one-year pilot)

**WORK IN PROGRESS**

Gunja, J.  *"Lessons Learned, a Unilateral Perspective of Life in the Corrections Field"*

Software and Corrections Application Program – "PREVENT" (an IT and applications program to simplify and increase intelligence gathering for the purpose of decreasing violence and serious incidents in correctional facilities)

## CONFERENCE PRESENTATIONS

1999
*"A Historical Perspective of the Federal Bureau of Prisons"*
Presented at the Monthly Cumberland (Md) Chamber of Commerce Meeting

2000
*"What it Takes to be a Leader in Corrections"*
Presented at the 2000 Federal Bureau of Prisons' Associate Wardens Conference in
Philadelphia, Pennsylvania

2002-2006
*"Lessons Learned from BOP Staff Homicides"*
Presented at various venues in Colorado for Federal Judges, Local Law Enforcement, and staff
at the Correctional Complex in Florence, Colorado

2006
*"Establishing Excellence in Corrections"*
Presented at the Victorville (Ca) Federal Correctional Complex dedication ceremony

2007
*"Incident Prevention and Response"*
Presented at the 2007 Federal Bureau of Prisons' Captain's Conference in Jacksonville, Florida

## TEACHING EXPERIENCE

1992-1995
Assistant Correctional Services Administrator
Central Office (Headquarters), Washington, D.C.
I was responsible for providing in-person training 10-12 weeks per year at the Management and
Specialty Training Center in Aurora, Colorado on courses relating to security, investigations,
emergency preparedness and response, and inmate care and management,

1999
Chief Executive Officer (Warden)
Federal Correctional Institution, Cumberland, Maryland
On a voluntary basis for the good of the community, and to improve students' awareness of
corrections, I taught a course at the Garrett County Community College in Keyser, West Virginia
on the book "The Hothouse."  This book was written by an author who spent years inside the
United States Penitentiary in Leavenworth, Kansas, and this course was very informative to my
students, some of which opted later to enter the corrections occupancy field.

2001 to 2004
Chief Executive Officer (Warden)
United States Penitentiary, Florence, Colorado
I was sought-out by many colleagues in the Bureau of Prisons as a keynote speaker and
instructor for topics such as: Use of Force, Special Housing Unit Management, Inmate
Management, Incident Prevention and Response, and Escape Prevention.  I presented these
training programs at over fifteen (15) facilities and the Management and Specialty Training
Center in Aurora, Colorado, which totaled over 1,000 students in this three-year era.

2004 to 2006
Chief Executive Officer (Regional Director)
Western Regional, Dublin, California
I was the keynote speaker at two Warden's Conferences while I was the Regional Director for courses on Use of Force and Management of Special Housing Units. I also presented this course at the 2005 National Warden's Video Conference.

In addition, I taught various courses to staff at all facilities I was a Captain, Associate Warden, or Warden at—during pre-service and in-service training, as well as specialty training.

## COMMITTEE MEMBERSHIPS

2004-2006
Chief Executive Officer (Regional Director)
I was a member of the Bureau of Prisons' Executive Staff, which was comprised of the Director, six Regional Directors, and eight Assistant Directors. This group made all management, personnel, and policy decisions for the entire agency during our bi-monthly meetings and video conferences. I was instrumental in bringing a great deal of positive change to the BOP, much of which encompassed my region.