# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

DARIUS ISHUN GREEN,

    Plaintiff,

       v.

BRAD HOOKS, et al.,

    Defendants.

CV 614-046

## O R D E R

Presently before the Court is Defendants' Motion for Summary Judgment. (Doc. 131.) Plaintiff, a former Georgia Department of Corrections ("GDC") inmate, alleges that Defendants violated the Eighth Amendment of the United States Constitution and brings suit under 42 U.S.C. § 1983. Defendants argue that they did not violate the Constitution and that they are immune from suit based upon the principle of qualified immunity. This Court agrees with Defendants.

### I. Background

The Court notes, at the onset, that Plaintiff has made exceedingly difficult this Court's task of determining what material facts are in genuine dispute. As Defendants noted in their reply brief, Plaintiff's response to Defendants' Statement

of Material Facts and Plaintiff's response to Defendants' motion for summary judgement repeatedly mystifies the facts, confuses the timeline of events, and makes multiple unsupported assertions.[1] These actions placed an excessive burden on the Court to continually parse through the record to determine fact from fiction, when in reality no genuine dispute of fact actually existed. See Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008) (citing with approval the Seventh Circuit's admonition that "judges are not like pigs, hunting for truffles buried in briefs"); Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) ("A district court is not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact.'").

---

[1] Local Rule 56.1 states that "Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, in addition to the brief, there shall be annexed to the motion a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof. Each statement of material fact shall be supported by a citation to the record. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party." This rule clearly requires the responding party to not only admit or deny any disputed material facts, but also to support any denial with citations to the record.
Unfortunately, Plaintiff has not adhered to these rules. At least thirteen times Plaintiff rebutted a statement of material fact by Defendant without providing a single citation to the record. (See Doc. 163 ¶¶ 38, 44, 77, 107, 121, 123, 126, 128, 133, 134, 135, 137, 166.) And, with some overlap, at least fourteen times Plaintiff's denial was not responsive to the fact asserted. (See id. ¶¶ 56, 65, 72, 73, 74, 77, 101, 107, 121, 123, 126, 128, 133, 137.)

## A. Plaintiff's Incarceration

Plaintiff's story begins on May 10, 2012, in the Georgia Diagnostic and Correction Prison ("GDCP"). The GDCP houses and classifies new inmates so that they can be appropriately placed inside the Georgia Prison System. (Doc. 131-1 ¶¶ 15-26.) As part of the classification program, prison officials evaluate the inmate's criminal history, individual characteristics, and mental and physical health needs. (Id.) Prison officials make an initial security classification to determine appropriate housing, levels of supervision, and work-detail assignment. (Id.) They also screen inmates in accordance with the Prison Rape Elimination Act ("PREA") to determine if they are at risk of being either a sexual victim or a sexual aggressor. (Id.) The PREA screening considers many factors, including the inmate's actual and perceived sexual orientation and gender identity, disabilities, age, physical build, incarceration history, criminal history, prior experiences of sexual victimization, and the inmate's own perception of vulnerability. (Id.) Prison officials gave Plaintiff a minimum security classification fit for general population and designated her[2] as neither a PREA victim nor a PREA aggressor. (Id. at ¶¶ 124-128.)

---

[2] Plaintiff is transgender. The Court will refer to Plaintiff using the feminine pronoun as Plaintiff identifies with the female gender although biologically male. (Doc. 131-1 ¶ 116.)

While at GDCP, Plaintiff also underwent orientation about prison life and the PREA. She acknowledged this orientation in writing, and she also acknowledged that she had the responsibility to request protective custody if she felt her safety threatened in the future. (Doc. 131-1 ¶¶ 121-123.) On July 19, 2012, prison officials transferred Plaintiff to Rodgers State Prison. (Id. at ¶ 130.)

## B. The Prison

Rodgers State Prison is a medium-security facility that houses adult male felons for the Georgia Department of Corrections. (Doc. 131-1 ¶ 46.) Located in Reidsville, Georgia, it consists of 6 buildings: Buildings A, B, C, F, G, and H. (Id. ¶ 48.) Each building is composed of four dormitories numbered 1-4. Inside each dormitory are either rooms or cells. And inside each room or cell are beds, which are numbered and assigned to individual inmates. Prison officials placed Plaintiff in Building A, Dormitory 1, Room 3, Bed 5. (Doc. 163, Exhibit 30.)

A1 Dormitory was a general-population dormitory. Inmates in general population were usually well-behaved and were all cleared to live with each inmate in their dormitory. (Doc. 131-1 ¶¶ 56, 57, 71.) A1 Dormitory housed inmates in an open format that allowed them to roam freely from room to room. (Id. at ¶ 55.) It had two halls with two bedrooms per hall, a television

room, and a day room. (Id. at ¶¶ 58-64.) Each bedroom had eight bunkbeds and housed sixteen inmates. (Id. at ¶ 60.)

The security in A1 Dormitory reflected its general population status. Officers were not continuously present in the dormitory, but they daily conducted multiple "official counts." (Doc. 131-1 ¶ 66.) The parties dispute the frequency with which those occurred, (see id.; doc. 131-11 at 134-136), but the number appears to be at least twice per day, and potentially up to five times per day, with at least one count occurring at night (doc. 131-11 at 134-136). Officers would also regularly enter the dormitory to deliver mail, and they conducted "census counts" several times per day, "including at each shift change." (Doc. 131-1 ¶ 67; Doc. 163 ¶ 67; Doc. 131-11 at 134-136.) Additionally, an officer located in the control room of building A monitored the hallways and common rooms of the A1 Dormitory 24 hours a day. (Doc. 131-1 ¶¶83-85; Doc. 141 at 41-44.)

A3 and A4 Dormitories, on the other hand, were used for Administrative Segregation. (Doc. 131-1 ¶¶ 80-81.) Prisoners placed in Administrative Segregation, unlike those placed in general population, usually have reason to be isolated from other prisoners. Thus, A3 Dormitory contained twenty-three double-occupancy cells and one single-occupancy cell, and A4 Dormitory contained twenty-four single-occupancy cells. (Doc. 131-4 ¶ 23.)

The security in A3 and A4 was also commensurate to its population. Prison policy required A3 and A4 security officers to perform 30-minute security and safety checks. (Doc. 131-1 ¶ 87.) Officers would document these safety checks by marking on a "door sheet" or "30-minute Check Sheet." (Doc. 143 at 18-20.) Additionally, Officers would notate information about individual inmates, such as whether an inmate ate his meals, took a shower, or went to the yard for exercise. (Id.)

## C. Plaintiff's Arrival

When Plaintiff arrived at Rodgers on July 19, the prison did not have enough beds to accommodate her in a general-population dormitory. (Doc. 131-1 ¶ 133.) Thus, prison officials put Plaintiff in Administrative Segregation and placed her in A4 Dormitory until they could find a permanent spot for her in the prison. Four days later, Prison officials moved Plaintiff to her permanent spot in the general-population A1 Dormitory. (Doc. 163, Exhibit 30.)

Plaintiff's troubles began almost immediately upon stepping foot into the A1 Dormitory. Prior to arriving at Rodgers, Plaintiff supposedly had breast enhancement surgery, and she maintained a feminine appearance upon entering Rodgers. (Doc. 163-3; Doc. 162 at 19.) Because of Plaintiff's feminine appearance, Plaintiff's arrival did not go unnoticed. (Id.)

On Plaintiff's first day in the dormitory, inmate Darryl Ricard, a retired member of the Vice-Lord gang who was serving a

life sentence without parole for the malicious rape of an eleven-year-old child in retaliation for her father's unpaid debts, approached Plaintiff to offer protection. (Doc. 131-1 ¶ 166.) Ricard claimed he was a lifer and only looking a friend. (Doc. 132-1 at 8.) Plaintiff assented. (Id.) But while Plaintiff and Ricard both agree that this initial encounter was not threatening or coercive, Plaintiff alleges that the relationship quickly turned sour. (Id. at 7-9.)

Plaintiff alleges that within two weeks Ricard demanded Plaintiff perform sexual acts upon him or else risk serious bodily harm. (Doc. 131-1 ¶ 171.) Plaintiff also alleges that Ricard threatened to have Plaintiff harmed if Plaintiff transferred to another building. (Doc. 132-1 at 11-12.) Thus, despite an initial resistance, Plaintiff states she relented to Ricard's demands and performed sexual favors for him for fear of her life.

Ricard, naturally, denies Plaintiff's allegations. Ricard alleges that he was Plaintiff's prison "husband" and that any sexual acts between the two were consensual. (Doc. 163-3 at 10:00-12:00.) Nonetheless, regardless of their differing views about whether such acts were consensual, Plaintiff and Ricard agree that during the next several weeks Plaintiff performed sexual acts upon Ricard multiple times. (Id.; Doc. 132-1 at 18.)

## D. The Meeting

On or around August 24, 2012, Plaintiff penned a letter to her mother stating that her "life was in great <u>danger</u>" and asking her mother for help. (Doc. 131-28 (emphasis in original).) Plaintiff's mother responded as any good mother would: She called Warden Bradley Hooks and informed him of the situation. (Doc. 131-1 ¶ 210.) On the same day, Warden Hooks summoned Plaintiff to his office to discuss the situation with him and Deputy Warden of Security John Brown. (Doc. 131-1 ¶ 214.)

In the confines of his office, Warden Hooks inquired into Plaintiff's personal well-being. The parties, however, cannot agree on exactly what questions the Warden asked. Defendants assert that Warden Hooks asked Plaintiff whether she was in any danger or wanted to go into protective custody. (Doc. 131-1 ¶¶ 219-222.) But Plaintiff denies that Warden Hooks ever "specifically asked Plaintiff if she was in danger" or that he ever "ask[ed] Green directly if she wanted to be placed in protective custody." (Doc. 163 ¶¶ 219-222.) Nevertheless, the parties agree that, whatever questions were asked, Warden Hooks elicited from Plaintiff statements that she was not afraid and that she did not have any problems. (Doc. 131-1 ¶¶ 223-224.) The parties also agree that Plaintiff never disclosed to Warden Hooks or Deputy Warden Brown that Ricard, or anyone, was sexually assaulting her in A1 Dormitory, that she never asked to

be moved to a different dormitory or camp, and that she never admitted to being so much as uncomfortable in A1 Dormitory. (Doc. 144 at 85-88.)

During their meeting, Warden Hooks also went beyond merely talking to Plaintiff. In response to questions he had about the veracity of Plaintiff's assurances in light of her mother's grave complaints, he telephoned Plaintiff's mother. (Doc. 144 at 84.) He spoke with Plaintiff's mother himself, and he also gave Plaintiff the opportunity to speak with her mother. (Id. at 84-85.) But Plaintiff continued to assure Warden Hooks she had no problems. (Id.) Unable to substantiate any of the claims made by Plaintiff's mother, Warden Hooks arranged for Plaintiff to return to A1 Dormitory in a manner that would not raise suspicion among the other inmates. (Id. at 85.)

Several weeks later, on September 17, 2012, Plaintiff, allegedly, made another cry for help. Plaintiff claims she wrote a letter alleging that Ricard was forcing her to perform sexual acts in A1 Dormitory. (Doc. 131-1 ¶ 225.) Plaintiff claims that she addressed the letter to the Deputy Warden of Security and placed it in the prison mailbox. (Id. ¶ 226.) Defendants claim no Defendant ever received or read this letter. (Id. ¶¶ 257-259.) Plaintiff claims Defendants are lying, but she can offer no proof for this assertion beyond her own testimony. (Doc. 163 ¶¶ 257-259.)

## E. "Put on the Door"

On the night of Thursday, September 21, 2012, inmates in A1 Dormitory, allegedly tired of having too many open homosexuals in the dormitory, forced Plaintiff and two other inmates to exit the dormitory. (Doc. 131-1 ¶¶ 261-263.) In prison parlance, Plaintiff and the other ousted inmates were "put on the door." (Id.) Plaintiff packed her belongings, exited the dormitory, and waited for a security officer so that she could request protective custody. She viewed her departure from A1 Dormitory as a blessing, because it finally granted her freedom from Ricard without any fault of her own. (Doc. 132-1, p. 24.)

Unfortunately, Plaintiff's relief was short lived. When Ricard learned that Plaintiff had been put on the door, he informed Plaintiff that he would join her. (Doc. 131-1 ¶ 266.) Whether Ricard joined because he feared retaliation for protecting homosexual inmates, as he claimed, or because he desired to follow Plaintiff to her next location for more nefarious purposes, is not clear. What is clear, however, is that Ricard requested protective custody in response to the ouster of inmates Green, Reid, and Kiya, and that prison officials placed him in Administrative Segregation because of his request. (Id. ¶ 267.) Also clear, despite Plaintiff's averments to the contrary, is that Ricard left A1 Dormitory at the same time as the other three inmates. (Doc. 132-1 at 23-24; Doc. 131-1 ¶ 277.)

Once outside the dormitory, all four inmates were met by Lieutenant Terrie Grubbs, and they requested protective custody. (Doc. 131-1 ¶ 272; Doc. 132-1 at 24.) Another officer then escorted Plaintiff to the shower room of A4 Dormitory, while a third officer placed Ricard in A3 Dormitory. (Doc. 131-1 ¶¶ 292A-294.)

For the next five hours, from 11:00 p.m. on September 20, 2012, to 4:00 a.m. on September 21, 2012, Plaintiff remained in the shower room of A4 Dormitory. (Doc. 131-1 ¶ 298.) During that time, she wrote a statement detailing her request for protective custody, and she made small talk with officers. (Id. at ¶ 296-299.) At no point in either her written statement or casual conversation with officers did she mention that Ricard had sexually assaulted her in A1 Dormitory. (Id. ¶ 300.) Then, around 4:00 a.m. an unknown officer, but not Lt. Grubbs, escorted Plaintiff to Cell 22 of A3 Dormitory — the cell of inmate Darryl Ricard. (Id. ¶¶ 302-303.)

## F. The Assault

Once in Cell 22, Plaintiff's situation allegedly went from bad to worse. After a short reprieve in which Ricard allowed Plaintiff to get some sleep, Plaintiff alleges that Ricard demanded Plaintiff perform sexual acts on him. (Doc. 131-1 ¶¶ 319-320; 347-351.) Plaintiff alleges that Ricard threatened her with a razor blade and then proceeded to orally and anally rape her. (Id. ¶¶ 350-351.) After the assault, Plaintiff returned

to her bed and wrote a letter claiming that she had just been raped. (Id. ¶ 354.) When Ricard was not looking, Plaintiff slipped the note under the cell door. (Id. ¶ 355.) Approximately two minutes later, guards opened the door of Cell 22 to see Ricard threatening Plaintiff with a razor blade. (Id. ¶ 363.) The responding sergeant convinced Ricard to drop the blade, guards removed Ricard from the cell, and the Sexual Assault Response Team arrived to investigate the situation. (Id. ¶¶ 364-367.)

After the alleged assault, Plaintiff and Ricard submitted to an interview with the GDC's Internal Investigation Unit. In her interview, Plaintiff informed investigators that Ricard had been sexually assaulting her for weeks and that none of their sexual contact had been consensual. (Doc. 132-1 at 9-14.) Ricard, for his part, asserted that the sexual contact was consensual and that Plaintiff admitted to him she was setting him up in order to fabricate a lawsuit against the prison. (Doc. 163-3.) State prosecutors subsequently twice attempted to indict Ricard. (Doc. 171 at 15.) The grand juries rejected both attempts. (Id.) Ricard never faced any criminal charges for the alleged rape. (Id.) In 2014, Plaintiff filed suit in this Court.

## II. Standard of Review

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is

12

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law, and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because the standard for summary judgment mirrors that of a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial. Id. at 323. When the movant does not carry the burden of proof at trial, it may satisfy its initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929

F.2d 604, 606-08 (11th Cir. 1991) (explaining <u>Adickes v. S.H.</u> <u>Kress & Co.</u>, 398 U.S. 144 (1970) and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986)). The movant cannot meet its initial burden by merely declaring that the non-moving party cannot meet its burden at trial. <u>Clark</u>, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Id.</u> When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presented evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." <u>Fitzpatrick</u>, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. <u>See</u> <u>Morris v. Ross</u>, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Plaintiff notice of the motions for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 133.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

### III. Discussion

Plaintiff asserts two theories of recovery: (1) Plaintiff asserts that all Defendants violated the Eighth and Fourteenth Amendments to the United States Constitution because they were deliberately indifferent to a known risk that Plaintiff would be sexually assaulted, and (2) Plaintiff asserts a supervisory-liability claim against all Defendants for violating the Eighth Amendment by failing to protect Plaintiff from sexual assault in the A1 and A3 Dormitories. Although Plaintiff's supervisory-liability claims merely re-hash her deliberate indifference claims, the Court will analyze each claim separately. It begins with the question of deliberate indifference.

### A. Deliberate Indifference Claims

Plaintiff's deliberate indifference claim rests upon the Eighth Amendment's prohibition of "cruel and unusual punishment." Essentially, Plaintiff claims that Defendants knowingly ignored dangers to Plaintiff such that the conditions

Plaintiff faced in prison constituted cruel and unusual punishment. Because the Supreme Court has extended the Eighth Amendment's prohibitions to the States, Plaintiff may properly make an Eighth Amendment claim against Defendants, employees of the State of Georgia. See Rhodes v. Chapman, 452 U.S. 337, 344-45 (1981). Thus, the Court must determine if Defendants' actions violated the Eighth Amendment.

The Eighth Amendment, as interpreted by the Supreme Court, applies to the treatment of prisoners as well as the conditions of their confinement. Rhodes, 452 U.S. at 345. While the Eighth Amendment "does not mandate comfortable prisons" or preclude "restrictive and even harsh" prison conditions, it does establish a minimum level of prisoner safety. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994). Thus, a prison official violates the Eighth Amendment when both (1) his acts or omissions deny prisoners "the minimal civilized measure of life's necessities," and (2) he has a "sufficiently culpable state of mind," i.e., "one of deliberate indifference to inmate health of safety." Id. at 834 (citations omitted)(internal quotation marks omitted).

"To survive summary judgment in a case alleging deliberate indifference, a plaintiff must 'produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir.

16

2013)(quoting Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003)). To establish the deliberate indifference prong, a plaintiff must prove "'(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.'" Id. at 1332 (quoting Townsend v. Jefferson County, 601 F.3d 1152, 1158 (11th Cir. 2010)). Or, put differently, "[t]o be deliberately indifferent, a prison official must know of and disregard 'an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (emphasis in original) (quoting Purcell ex. rel. Estate of Morgan v. Toombs Cty., Ga, 400 F.3d 1313, 1319-20 (11th Cir. 2005)). Thus, to prove deliberate indifference, a plaintiff may not merely prove the defendant should have objectively known that a substantial risk of serious harm existed, but that the defendant "subjectively knew of the substantial risk of serious harm and that [he] knowingly or recklessly disregarded that risk." Id.

Deliberate indifference, however, is not merely negligence. The deliberate indifference standard requires "a great deal more" proof than a traditional negligence standard. Goodman, 718 F.3d at 1332. "'It is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for

the victim's safety.'" _Id._ at 1333 (quoting _Farmer_, 511 U.S. at 834).

The heightened deliberate indifference standard reflects the fact that "just as not every injury is an injury of constitutional magnitude, not every wrong that would be actionable under state or common law is cognizable as a constitutional tort under § 1983." _Goodman_, 718 F.3d at 1333. It also reflects the fact that judges are ill-suited to meddle, even with the best of intentions, in the day-to-day operations of the nation's prisons. _Id._ at 1334. Therefore, federal courts must be careful to strictly adhere to the exacting standards for deliberate indifference claims and avoid the temptation to apply a lesser standard in acquiescence to any personal sympathies or desires, no matter how justified. _Id._

_Goodman v. Kimbrough_ provides a particularly vivid illustration of the high walls a plaintiff must scale before succeeding on a deliberate indifference claim. In _Goodman_, the plaintiffs, a 67-year old man with dementia, Mr. Goodman, and his wife, Mrs. Goodman, sued prison officials after Mr. Goodman's cell mate viciously beat him in the night. Despite overwhelming evidence of negligence, however, the Eleventh Circuit declined to find a violation of his constitutional right to be free of cruel and unusual punishment.

Police arrested Mr. Goodman for mistakenly trying to gain entry into a neighbor's trailer during an evening walk. Upon

learning of her husband's arrest, Mrs. Goodman drove to the police station where she provided copies of her husband's medical records and requested that he be placed in an isolation cell "so that he would not unintentionally insult another inmate and thereby come in harm's way." 718 F.3d at 1329. Despite Mrs. Goodman's request, however, police housed her husband with another inmate.

When the officers returned to the cell several hours later, they found Plaintiff covered in blood with contusions on his face, his eyes swollen shut, and the floor of the cell "laden with blood." 718 F.3d at 1330. When asked what caused his injuries, "Goodman, clearly bewildered, lifted up his hands and said, 'These two right here.'" Id. The sheriff's department subsequently determined that Goodman's cellmate was the real culprit. As a result of his injuries, Goodman spent seven days in the intensive-care unit and an additional two to three weeks in the jail infirmary.

Plaintiff and his wife sued prison officials on a claim of deliberate indifference. Plaintiffs presented two particularly damaging pieces of evidence. First, prison policy stated that officers were supposed to perform "head counts" at 6:00 p.m. and 12:00 a.m. every night in which they would physically enter the cells and look at prisoners' faces and check their armbands. Additionally, they were supposed to perform "cell counts" every hour after 12:00 a.m. in which they would look into the window

of each cell. On the night of the incident, one officer conducted a "head count" at 6:00 p.m., but he failed to enter the cell and merely looked through the window. Neither officer on duty conducted the 12:00 a.m. "head count" or even a single "cell count." Plaintiff also presented evidence that another inmate had repeatedly pushed the emergency call button to notify officers of the fight in Goodman's cell, but officers deactivated the call button and failed to investigate the situation.

Despite the definitive evidence of negligence, the Court of Appeals affirmed the district court's opinion in favor of the defendants. The Court noted that although the judges were "disturbed by the dereliction of duty that facilitated the violence visited upon Goodman while he was under the officer's charge," Goodman failed to prove that either officer was "subjectively aware of the peril to which Goodman was exposed on the night in question." 718 F.3d at 1334. The Court concluded that:

> the fact that the officers deviated from policy or were unreasonable in their actions — even grossly so — does not relieve Goodman of the burden of showing that the officers were subjectively aware of the risk; in other words, he cannot say, "Well, they should have known." Were we to accept that theory of liability, the deliberate indifference standard would be silently metamorphosed into a font of tort law — a brand of negligence redux — which the Supreme Court has made abundantly clear it is not.

Id. (citing Farmer, 511 U.S. at 838).

The facts of this case dictate a similar outcome. Plaintiff makes three claims: (1) Defendants "condon[ed] and promot[ed] unsafe prison conditions known to place transgender Green in substantial risk of physical injury"; (2) Defendants "show[ed] deliberate indifference to actual physical injuries Defendants knew Green had suffered and thereby creating an environment that led to her actually being anally raped"; and (3) Defendants "show[ed] deliberate indifference to Green being placed in a protective-custody cell with an inmate Defendants (at the very least Grubbs and John Doe) knew was Green's sexual assailant." (Doc. 1 ¶41.) To support her claims, Plaintiff makes several factual allegations, including: (1) Defendants knew Plaintiff was transgender upon her arrival at Rodgers but ignored the dangers she faced as a transgender by placing her in a general population dormitory; (2) Defendants knew Plaintiff was in "substantial danger" because A1 Dormitory was a dangerous place with high rates of sexual assault; (3) Defendants knew Plaintiff faced a substantial risk of assault by inmate Ricard because Plaintiff's mother had informed Warden Hooks she was in danger and Defendants Hooks and Brown received a letter from Plaintiff alleging that Ricard was sexually assaulting her; and (4) Defendants knew that Plaintiff faced a substantial risk of harm when they placed her in a cell with inmate Ricard after Plaintiff and Ricard were "put on the door." Even taking Plaintiff's evidence in a light most favorable to her, however,

Plaintiff has failed to provide sufficient evidence by which any reasonable jury could find any Defendant was deliberately indifferent to a substantial harm. See Goodman, 718 F.3d at 1332 ("[The plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient." (internal quotation marks omitted)).

### 1. Subjective Knowledge of a Risk of Serious Harm

Plaintiff has failed to sufficiently prove that any Defendant had subjective knowledge of a risk of serious harm. Plaintiff makes several attempts to establish subjective knowledge. In the opening pages of her response brief, Plaintiff claims that "Hooks authorized Green to be put in administrative custody after guards recognized Green's feminine characteristics along with noticing Green had breasts during an initial strip search." (Doc. 162 at 2.) The clear inference of Plaintiff's assertion is that Defendants knew, from Plaintiff's very arrival, that Plaintiff would be exposed to harm if she was placed in general population, so they segregated her immediately. Plaintiff's assertion (and subsequent inference) fails to hold up for multiple reasons.

First, Plaintiff's assertion contradicts a Rule 36 admission she made during the course of discovery. Federal Rule of Civil Procedure 36 allows parties to request admissions of fact from the opposing party. The responding party must admit

22

the fact, or, "if not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). Once a party makes an admission, the admission "is conclusively established unless the Court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b).

In her initial interview with GDC's internal investigator, Plaintiff stated that she was placed in Administrative Segregation upon her arrival at Rodgers because the prison did not have enough bed space. (Doc. 132-1 at 5-6.) Prison officials recorded this interview on a CD. In response to Defendants' Rule 36 request for admissions of fact, Plaintiff admitted the CD that Defendants entered into evidence was a true and accurate copy of the audio recording of Plaintiff's statement to the GDC internal investigator. (Doc. 131-20 at 7.) She then admitted that the statements she made on the CD were "truthful and accurate." (Id.) This Rule 36 admission conclusively establishes, for purposes of this litigation, that prison officials placed Plaintiff in Administrative Segregation because the prison lacked sufficient bed space. Plaintiff is bound to that admission. Fed. R. Civ. P. 36(b); see Williams v. City of Dothan, Ala., 818 F.2d 755, 762 (11th Cir. 1987) (noting that a Rule 36 admission of fact is "conclusively established" and a district court is not free to ignore it). Plaintiff had full time and opportunity to review the audio recording and

23

reflect upon its accuracy. Plaintiff cannot now use alternative facts.

Plaintiff's assertion also suffers from another flaw: it lacks sufficient supporting evidence. Federal Rule of Procedure 56 requires that factual assertions be supported by some form of evidence. Plaintiff cites as support for her assertion paragraphs 14, 29, and 133 of her Response to Defendants' Statement of Material Facts. (Doc. 163.) Paragraphs 14, 29, and 133, however, do not contain a single citation to the record that supports Plaintiff's proposition that guards noticed Plaintiff's breasts and for that reason placed her in Administrative Segregation. Indeed, Plaintiff's citations do not even support the assertion that guards noticed her breasts or feminine appearance. Thus, even if Plaintiff had not made a Rule 36 admission, she has still failed to offer any support for her assertion, and the Court cannot declare any genuine issue of material fact as to why prison officials initially placed Plaintiff in Administrative Segregation. It must accept Plaintiff's own explanation — officials placed her in Administrative Segregation because the prison lacked adequate bed space.

Plaintiff's other evidence similarly fails to provide sufficient evidence of deliberate indifference. For example, although Plaintiff asserts that Warden Hooks "reviewed the sexual assault reports," she provides no evidence to prove her

assertion. At deposition, Plaintiff inserted the reports into evidence but failed to ask Warden Hooks any questions as to when he reviewed the records, how often he reviewed the records, or whether he was ever aware of the records. In fact, Plaintiff asked Warden Hooks no questions about the report and made no attempt to gather any evidence that Warden Hooks knew of the report and had knowledge of its contents.

But, even assuming that Warden Hooks did review the records, they hardly establish that he subjectively knew Plaintiff was in substantial danger of assault. The sexual assault report Plaintiff cites is not sufficient evidence to prove either a substantial risk of harm or that any Defendant had knowledge of such harm and recklessly disregarded it. The report records assault _allegations_ and the actions taken by prison officials in response to the allegations. (Doc. 167.) It spans five years and encompasses the entire 1,500 person prison, not merely A1 Dormitory. (_Id._) By the Court's count, it details twenty-eight allegations of sexual assault over that five year period, or, a little over five recorded allegations per year. Also by the Court's count, of the twenty-eight recorded allegations, three occurred in Building A, four in Building B, two in Building C, four in Building F, three in Building G, two in Building H, and ten in undisclosed locations. The charts also make clear that not all allegations are credible

and that some allegations are later retracted. (See 167 at 16, 26-28.)

Plaintiff has the burden of producing enough evidence such that a reasonable jury could conclude that Warden Hooks, or any Defendant, subjectively knew of a substantial harm to Plaintiff and also recklessly disregarded that risk. First, the report does not establish a substantial risk of harm to Plaintiff, or any prisoner. While any sexual assault is one too many, twenty-eight allegations of rape — not confirmed incidents — over the course of five years in a 1,500 person prison is not a substantial risk. Prisons are dangerous places because they are filled with people who society has already deemed too dangerous to live amongst law abiding persons. Prisoners will always be at some risk of harm simply by being surrounded by these people. Furthermore, the report itself shows that, at a minimum, Warden Hooks did not recklessly disregard a known risk of sexual assault. A review of the report indicates that Warden Hooks consistently instructed his employees to investigate every allegation. Thus, the sexual assault reports do not satisfy Plaintiff's evidentiary burden that Plaintiff faced a substantial risk of harm.

Nor does Plaintiff's allegation of subjective knowledge based upon Plaintiff's letter to her mother or her alleged letter to Deputy Warden Brown stand up to scrutiny. Upon receiving notice of Plaintiff's letter to her mother, Warden

Hooks took swift action to investigate Plaintiff's allegations. On the same day he became aware of Plaintiff's letter, Warden Hooks held a meeting with Plaintiff and Deputy Warden Brown during which Plaintiff denied she was in danger and refused to identify any potential assailant. Moreover, Plaintiff had the opportunity to speak with her mother in the presence of Warden Hooks. Plaintiff, however, gave Warden Hooks no information that could have enabled him to help her. Finally, Warden Hooks took additional measures to protect Plaintiff by providing her with paperwork that concealed from the other inmates in A1 Dormitory the true purpose of their meeting.

Given the lengths to which Warden Hooks went to investigate Plaintiff's complaint and Plaintiff's steadfast refusal to tell him the truth, no reasonable jury could find that he subjectively knew she was in danger. Although Hooks and Brown could have chosen to disbelieve Plaintiff in spite of her confidential assurances to the contrary, the Constitution does not require them to do so. It is illogical to conclude that Plaintiff could successfully claim prison officials not only should have known, but did in fact know, that she was in danger, despite her personal assurances that she was not.

Plaintiff's alleged letter to Deputy Warden Brown also fails to establish subjective knowledge. While Plaintiff might have written a letter to Deputy Warden Brown alleging Ricard as her assailant, she has provided no evidence of this letter other

than her own testimony. But, even taking her testimony as true for purposes of summary judgment, Plaintiff has provided no evidence that Deputy Warden Brown, or any Defendant, ever received or had knowledge of the letter. Moreover, simply receiving the letter would not have established deliberate indifference because "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." 718 F.3d at 1332.

A genuine dispute exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. Plaintiff has not provided sufficient evidence that a reasonable jury could conclude Defendants not only received the letter but subjectively knew that Plaintiff was at a risk of substantial harm. Such a conclusion would subject every official to trial if a prisoner merely alleged that she wrote a letter claiming abuse. Thus, Plaintiff's claim that she sent a letter to Defendants, without more, does not create a genuine dispute of material fact.

The Court also finds that even if one takes a holistic view of all potential inferences from each piece of evidence offered by Plaintiff, Plaintiff has still failed to produce sufficient evidence such that a reasonable jury could find Defendants subjectively knew Plaintiff was in substantial danger. Thus,

the Plaintiff has failed to provide sufficient evidence of deliberate indifference.

## 2. Disregard of a Substantial Risk

Even if Defendants did have subjective knowledge of a substantial risk, however, Plaintiff offers insufficient evidence that any Defendants disregarded that risk. Plaintiff's main argument on this element is that Defendants consciously disregarded a substantial risk to Plaintiff when they placed her in a cell with Ricard. Plaintiff produces some evidence that one Defendant might have authorized Plaintiff to be placed with Ricard (no one can dispute that somebody in the prison authorized the move), but Plaintiff fails to put forth any evidence that any Defendant knew that pairing the two prisoners together would have placed Plaintiff at a substantial risk of serious harm. Sure, Ricard had a criminal history of rape, but Plaintiff produced no evidence that any Defendant knew Ricard's criminal history at the time Plaintiff was placed in his cell. Neither is it a reasonable inference that they had such knowledge. Rodgers State Prison houses over 1,500 inmates, many of them convicted of violent felonies. Ricard was never labeled a PREA aggressor and Plaintiff was never labeled a PREA victim. (Doc. 131-2 at 6-7.) Furthermore, despite spending several hours in a secure location and giving testimony to officers, Plaintiff never mentioned any problems with Ricard or any history of sexual assault in A1 Dormitory.

The Court also notes that Plaintiff's assertion that Warden Hooks "authorized" Plaintiff to be in the same cell as Ricard is quite a stretch. After scouring the citations in Plaintiff's brief, the Court concludes that Plaintiff's assertion stems from two Administrative Segregation memos signed by Warden Hooks on September 21, 2012. The Administrative Segregation memos (each prisoner had a separate memo on a separate piece of paper) contained the cell number and bed number of each prisoner requesting Administrative Segregation. Plaintiff's inference is that because Warden Hooks could have seen the bed assignments on the separate memos, he must have approved Plaintiff and Ricard being placed in the same cell. Plaintiff, however, has not provided sufficient evidence to support this inference.

Plaintiff's evidence is insufficient to create a genuine dispute of fact over whether Warden Hooks disregarded a substantial risk to Plaintiff when he signed the Administrative Segregation memos. Administrative Segregation memos are documents sent to the Warden when prisoners request protective custody. (Doc. 141-1 at 2-3, Doc. 142-3 at 5-6.) Per prison policy, the Warden must sign the memos before the Classification Committee can determine if protective custody is warranted. (Id.; Doc. 131-4 ¶¶ 31-32; see Doc. 131-31.) The purpose of signing the memos is not to "approve" the cell assignments of inmates in Administrative Segregation. (Doc. 142 at 71-72, 92-96.) The purpose is to review the merits of each prisoner's

request. (Id.) The prisoner's cell assignment is secondary information. (See docs. 131-31, 131-32.) Plaintiff cannot impute knowledge of a substantial risk based on an inference that the Warden would recognize, based on two separate memos, on two separate pieces of paper, that two prisoners without a PREA aggressor or PREA victim designation were not only placed in the same cell, but should not have been placed in the same cell. Warden Hooks testified that he could have up to fifty such memos on his desk at a given time, and the prison contains 1,600 inmates. (Doc. 142 at 93.) Additionally, Warden Hooks testified that he did not notice that Ricard and Plaintiff were in the same cell at the time he signed the two memos. (Id.) No reasonable jury could expect the supervisor of such a large facility to have such substantial knowledge of its numerous, ever-changing inmates and connect all the various dots required to even have a hunch that Plaintiff and Ricard should not have been placed together — especially not under a standard more lenient than gross negligence.

Plaintiff's second piece of evidence that Defendants disregarded a substantial risk is her evidence that they left the doors to the four rooms of A1 Dormitory unlocked during the night, contrary to prison protocol. This evidence, however, fails to demonstrate a disregard for a serious harm. A1 Dormitory is a general population dormitory that allows all prisoners to roam freely, even under standard protocol, for 18

hours a day. (See Doc. 141 at 61-64.) The four rooms left unlocked housed sixteen inmates apiece. (Doc. 142 at 84-85; Doc. 131-4 at 5-6.) The logical conclusion of Plaintiff's inference, then, is that not locking the doors of four sixteen person rooms for six hours of the day that happen to occur when the sun is no longer in the sky amounts to a substantial risk of serious harm, and Defendants disregarded that risk when the failed to enforce the policy of locking the doors. The Court declines to make such a declaration. While Defendants might have acted negligently, their failure to lock the doors, in light of all the evidence, does not present sufficient evidence such that a reasonable jury could find Defendants disregarded a substantial risk to Plaintiff.

Plaintiff's other allegations do not fare much better. Plaintiff alleges that Defendant Hooks disregarded a substantial risk to Plaintiff because "there is no evidence that Hooks took any disciplinary measures against inmates who engaged in consensual or non-consensual sex acts, even though he reviewed the sexual misconduct reports — the brightest example of this is that Hooks did not ensure that Ricard received a disciplinary report after Ricard sexually assaulted Green." (Doc. 162 at 6.) This evidence is misleading in several respects.

First, Warden Hooks did not, as Plaintiff suggests, ignore Ricard's alleged rape. After the incident, a Sexual Assault Response Team conducted an investigation and determined that the

allegations of rape were substantiated. (Doc. 142-15.) Warden Hooks then referred the incident to the Internal Investigation Unit and allowed them to conduct a full investigation. (Id.; Doc. 142 at 81-83.) Subsequently, state prosecutors attempted to secure an indictment from a two separate grand juries and both refused to indict Ricard. (Doc. 171 at 15.)

Second, Plaintiff provides no evidence that Warden Hooks failed to take disciplinary action when he should have. She cites to the Sexual Assault Report and Paragraph 144 of her response to Defendants' Statement of Material Facts, but neither supports an assertion that Hooks failed to discipline inmates for sexual misconduct. To the contrary, the Sexual Assault Report shows the actions Warden Hooks took to investigate allegations of sexual assault. Additionally, because the records merely show the complaints alleged by inmates and the immediate action taken by correctional officers, it provides no evidence of substantiated claims of sexual assault or resulting discipline. Thus, it provides no evidence that Warden Hooks failed to discipline prisoners who were found to have committed sexual misconduct.

Paragraph 144 likewise includes no information proving the assertion that "no one ever got disciplined for consensual or nonconsensual sexual encounters." Other than the assertion that Ricard was not disciplined — a misleading, if not false, assertion — Plaintiff provides no evidence detailing cases

33

deserving of discipline where no discipline was given. She merely asserts that "no one ever got disciplined" and cites the incident report of Darryl Ricard. This is not sufficient evidence or citation for such a bold assertion.

Plaintiff also asserts as evidence of disregard that "Hooks was repeatedly told that control booths were not manned inside the dorms, but again, Hooks took no corrective action." (Doc. 162 at 6.) Plaintiff cites as support for this assertion minutes from a safety team meeting as well as Paragraph 72 of her response to Defendants' Statement of Material Facts. Once again, however, Plaintiff's assertion is misleading.

The minutes referred to by Plaintiff state the following: "Due to the staff shortage in security control rooms are not being manned in the dorms. Officers are required to carry keys for the building inside living areas." (Doc. 163-8.) These minutes, however, are not the whole story. Deputy Warden Brown unambiguously testified that the control room in building A was always manned, and he explained why it was always manned:

> Q: Out of the seven control rooms that you just named, which control rooms were not being manned during the month of July 2012?
> A: Specifically, I can't say. But if — if any, it would have only been available — or there would have only been three that they could not have manned during that month.
> Q: Which were those?
> A: B, C, and F Builidng.
> Q: Why is that?
> A: Population dormitories on both sides of the building. There's population all around.
> Q: Oh, okay. I got you. So A is not population dormitories because it has seg units —

34

A: The seg unit —
Q: — on one side?
A: — side of A building requires the control room to be manned.
Q: Okay. So that was what I was trying to get. So you can say for certain that — from July 1, 2012, through September 22, 2012, that the control room in the A building was being manned?
A: Yes.

(Doc. 141 at 41-42.)

Even after taking this deposition, Plaintiff procured no other evidence showing to which building the Safety Meeting notes referred. No reasonable jury could agree with Plaintiff's interpretation of the facts. While the evidence presented might create a mere inference that the control room in A1 Dormitory was not manned on a regular basis, given the totality of the evidence, such an inference is not reasonable.

## B. Supervisory-Liability Claim

In addition to her claims of deliberate indifference, Plaintiff also makes supervisory-liability claims against Hooks, Brown, and Grubbs for proximately causing Green's injuries. Supervisory defendants may only be held liable under § 1983 "if they personally participated in the allegedly unconstitutional conduct or if there is 'a causal connection between [their] actions . . . and the alleged constitutional deprivation.'" West v. Tillman, 496 F.3d 1321, 1328 (11th Cir. 2007)(quoting Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)). They cannot be held liable for the unconstitutional acts of their subordinates under the traditional tort standards of respondeat

superior or vicarious liability. <u>Cottone</u>, 326 F.3d at 1360. Because the Court has already determined that no unconstitutional conduct occurred, Plaintiff cannot prove that any Defendant personally participated in or caused a constitutional deprivation. Thus, Plaintiff's supervisory-liability claims fail.

## C. Qualified Immunity

Qualified immunity aims to limit personal liability of government officials by allowing them to "reasonably anticipate when their conduct may give rise to liability for damages." <u>Anderson v. Creighton</u>, 483 U.S. 635, 646 (1987)(internal quotations omitted). It provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)(citations omitted).

Establishing qualified immunity is a two-step process. First, the official must "prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." <u>Vineyard v. Wilson</u>, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002)). If "the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."

Id. To prove qualified immunity is not appropriate at the summary-judgment stage, the Plaintiff must prove (1) that the officer's actions violated the constitution, and (2) the constitutional right violated was clearly established. See id. at 1346.

All Defendants involved in this litigation were acting under their discretionary authority, thus the question to be answered is whether Plaintiff has provided sufficient evidence such that a reasonable jury could conclude that any of the Defendants' actions violated the Constitution and the constitutional right violated was clearly established. As this Court has already discussed, none of Defendants' actions violated the Constitution. Because the Defendants did not violate a constitutional right, the Court cannot address whether the right was clearly established. Thus, Defendants are entitled to qualified immunity.

### IV. Conclusion

In reaching its conclusion, the Court stresses that the Plaintiff's failure to produce evidence of deliberate indifference does not necessarily mean that officials at Rodgers State Prison did nothing wrong. The Court is simply bound by the high standards of deliberate indifference mandated by the Constitution and the Supreme Court.

Because Plaintiff has failed to establish deliberate indifference, and because Defendants are entitled to qualified

immunity, the Court **GRANTS** Defendants' motion for summary judgment. (Doc. 131.) The Court also **DENIES** as moot Defendants' motion to exclude expert testimony. (Doc. 134.) It **DIRECTS** the Clerk to **CLOSE** this case and **ENTER JUDGMENT** in favor of Defendants and against Plaintiff.

**ORDER ENTERED** at Augusta, Georgia, this 21st day of March, 2017.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA